UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MURRAY BRAUN,

      Plaintiff,

        v.

UNITED STATES OF AMERICA, *et al.*,

      Defendants.

Civil Action No. 20-2613 (JEB)

## MEMORANDUM OPINION

Five years ago, Congress established the United States Victims of State Sponsored Terrorism Fund, which largely draws from sanctions penalties to compensate those who have obtained judgments against foreign states for acts of state-sponsored terrorism. Plaintiff Murray Braun is one such judgment creditor. Believing that more money should be paid out more frequently from the Fund, he filed this action under the Administrative Procedure Act to challenge the Government's interpretation of the Fund's enabling statute and subsequent 2019 amendment. Braun asks the Court to increase the overall pot of funds, require additional payments, and set specific deadlines for those payments. His desired mandates would net him another payment on top of the roughly $250,000 he has received to date. Government Defendants not surprisingly object, and they now move to dismiss both for lack of jurisdiction and for failure to state a claim.

The Court, as it may for questions of statutory jurisdiction, assumes that it has authority to review Plaintiff's causes of action. On the merits, it holds that Braun's claims collapse on statutory-interpretation grounds or are otherwise moot. Dismissal is thus warranted.

## I.     Background

Under the Foreign Sovereign Immunities Act, courts can order state sponsors of terrorism to pay damages to their victims.  See 28 U.S.C. § 1605A.  Congress has facilitated victims' ability to collect these damages in multiple ways, including by setting up the United States Victims of State Sponsored Terrorism Fund in 2015.  See Compensation for United States Victims of State Sponsored Terrorism Act, Pub. L. No. 114-113, § 404, 129 Stat. 2242, 3007 (2015).  It has subsequently amended this Terrorism Act twice — first in 2019 and then in 2020. See United States Victims of State Sponsored Terrorism Fund Clarification Act, Pub. L. No. 116-69, § 1701, 133 Stat. 1134, 1140–43 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 1705 (2020).

When setting up the program in 2015, Congress initially appropriated $1.025 billion to the Fund.  See Pub. L. No. 114-113, § 404(e)(5).  It directed that future funding come from certain assets of Iran, as well as from funds and property forfeited to the United States for sanctions violations.  Id. § 404(e)(2).  To be precise, the Terrorism Act specified that all criminal financial penalties against sanctions violators would funnel into the Fund and that half of these types of civil penalties would also flow there.  Id. § 404(e)(2)(A)(i)–(ii).

To "administer the compensation program," Congress directed the Attorney General to appoint a Special Master.  See 34 U.S.C. § 20144(b)(1)(A).  The first to take on that mantle was Kenneth Feinberg, who solicited claims, determined which were eligible, and dispensed compensation in accordance with the Terrorism Act's prescriptions.  See ECF No. 9 (Def. MTD) at 4.  More specifically, the statute mandated that he first cap claims at $20 million, then calculate their unpaid balance, and ultimately use that sum in determining how to distribute *pro rata* payments to claimants .  Id. §§ 20144(d)(3)–(4).  As for timing, the Terrorism Act

contemplated the Special Master's authorizing a first round of payments within a year of December 18, 2015, a second round less than two years thereafter, and subsequent rounds annually, so long as money remained available.  Id. §§ 20144(d)(2)–(4).  In addition to administering payments, the initial Special Master also devised "the procedures necessary for United States persons to apply and establish eligibility for payment."  Id. § 20144(b)(2)(A); ECF No. 9-2 (Fund Procedures); Def. MTD at 5 (summarizing those procedures).

Among those eligible were individuals with a final district-court judgment that held a designated state sponsor of terrorism liable for damages for an injury arising from torture, extrajudicial killing, aircraft sabotage, hostage taking, or providing material support for these actions.  Plaintiff Murray Braun falls within this definition.  His granddaughter was killed in Jerusalem in an attack executed by Hamas, which another court in this district found had received "long-standing material support and resources" from the Islamic Republic of Iran. Braun v. Iran, 228 F. Supp. 3d 64, 76–77 (D.D.C. 2017).  On these findings, it awarded him $2.5 million in compensatory damages against Iran in 2017.  Id. at 84–85.

Plaintiff then applied to the Fund, and he received a first payment of $104,888 in January 2019 during the Fund's second round of distributions.  See ECF No. 1 (Complaint), ¶ 12; Def. MTD at 8, 27; ECF No. 9-4 (Declaration of Jane K. Lee), ¶ 4.  That same year, as mentioned above, Congress amended the Terrorism Act by passing the Clarification Act, which made several "[t]echnical [c]orrections."  Pub. L. No. 116-69, § 1701(b).  Most important for our purposes, it increased the proportion of civil penalties deposited into the Fund from 50% to 75% and explicitly authorized a third round of payments.  Id.  For this third distribution, the Clarification Act specified that the Fund would accept applications until February 19, 2020, and needed to authorize payments by May 19 of that year.  Id.  Heeding these instructions, the Fund

3

then reviewed new applications and allocated $1.075 billion for its third round of distributions.
See ECF No. 9-1 (Special Master June 2020 Report) at 3.  Plaintiff was notified on August 31,
2020, that he would receive almost $146,000 in the third round.  See Lee Decl., ¶ 4.

Growing impatient to receive this distribution, Braun asked a Fund attorney when he
would receive his payment.  See ECF No. 1-4 (Robert Tolchin and Anish Mathur Emails) at 7.
Ensuing emails between his counsel and the Fund revealed sharp disagreements in how the Fund
was interpreting its statutory framework and obligations.  Id. at 1–5.

Finding himself at an "impasse" with the Fund, see Compl., ¶ 42, Plaintiff then brought
this suit under the Administrative Procedure Act on September 16, 2020, against the United
States of America, then-Attorney General William Barr, the Department of Justice, then-
Treasury Secretary Steven Mnuchin, the Department of Treasury, and then-interim Special
Master Deborah Connor.  Id., ¶¶ 13–19.  He seeks a declaration on four aspects of the Fund's
operations: 1) The Clarification Act's increased percentage of civil penalties to be deposited into
the Fund should be retroactive to December 18, 2015; 2) The Fund must dispense a supplemental
third-round distribution; 3) When the Fund has more than $100 million, the Attorney General
must appoint a Special Master, and the Fund is required to make a distribution; and 4) The Fund
is required to distribute payments by January 1 of each year and was previously required to make
its third-round payments by May 19, 2020.  Id., ¶¶ 33, 49, 59, 79–80.  He also seeks an
injunction compelling Defendants to comply with the above interpretations.

Defendants have now moved to dismiss the Complaint pursuant to Federal Rules of Civil
Procedure 12(b)(1) and 12(b)(6).  See Def. MTD at 2.

## II.     Legal Standard

In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

In general, courts must first address jurisdictional arguments before turning to the merits. See Sinochem Int'l Co. v. Malaysia Int'l Shipping Co., 549 U.S. 422, 430–31 (2007).  Under Rule 12(b)(1), Plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear his claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  A court also has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  "For this reason, 'the plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)) (cleaned up).

Regarding the merits of Plaintiff's claims, Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  The Court need not accept as true, then, "a legal conclusion couched as a

factual allegation," nor an inference unsupported by the facts set forth in the Complaint.

Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain,

478 U.S. 265, 286 (1986)) (internal quotation marks omitted).  For a plaintiff to survive a

12(b)(6) motion, the facts alleged in the complaint "must be enough to raise a right to relief

above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007) (citing

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## III.   Analysis

The Court begins with its jurisdiction to entertain this suit and then continues on to

analyze the merits of the action.

### A.  Jurisdiction

Right out of the gate, Defendants argue that the Terrorism Act's plain text bars Plaintiff's

suit.  See Def. MTD at 12.  The statute indeed provides that "[a]ll decisions made by the Special

Master with regard to compensation from the Fund" are "not subject to administrative or judicial

review."  34 U.S.C. § 20144(b)(3).  The question is whether the Act forbids any or all of the

claims Braun brings here.

No court has previously ruled on whether (and to what extent) the statute permits judicial

review, so this Court would be conducting a fresh inquiry.  As a general matter, there is a "strong

presumption that Congress intends judicial review of administrative action."  Bowen v. Mich.

Acad. of Family Physicians, 476 U.S. 667, 670 (1986).  That presumption can be rebutted,

however, with "clear and convincing evidence" of a legislative intent to "restrict access to

judicial review."  Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967).

Against this backdrop, the Court begins with the scope of the Special Master's role.

Charged with the duty to "administer the compensation program described in this section," 34

U.S.C. § 20144(b)(1)(A)(iii), he dispenses payments according to the eligibility criteria, allocation methodology, and timelines specifically articulated by the statute.  Id. §§ 20144(c)– (d), see Special Master June 2020 Report at 9 (explaining denials were all because "claimants did not meet the statutory eligibility requirements").  Bound by these specifications, he thus serves as an administrative functionary: he determines, for example, whether an individual is statutorily eligible, which of her claims qualify for recovery, whether she has provided adequate supporting documentation, and how much she has already collected from sources other than the Fund, concluding his work by churning the final sum through a mechanical *pro rata* formula.  See Fund Procedures at 45536–38.  The Special Master thus makes consequential determinations under this authority, and such decisions affecting individual compensation are expressly shielded from judicial review.

Reading the preclusion provision against the Special Master's delegated authority thus makes clear that challenges to his individual determinations regarding eligibility and entitlement are barred.  Indeed, as the next provision of the statute explains, aggrieved claimants' sole recourse for challenging these determinations is to request a hearing before the Special Master, whose written decision is "final and nonreviewable."  Id. §§ 20144(b)(4)(A)–(B).  This review provision encompasses both the Special Master's individual eligibility determinations, which would deny a claim "in whole," and his decisions regarding individual claim amounts, which would deny a claim "in part."  Id. § 20144(b)(4)(A).  Congress thus specifically provided for review of these decisions through an administrative process, not through the courts.

It is arguable, however, that, at least as to some of his claims, Plaintiff challenges neither the Special Master's eligibility determination nor the specific amount he disbursed.  See Compl., ¶¶ 4–6.  Rather, Braun maintains that the suit contests the Fund's interpretation of its statute.  If

Defendants were correct in saying that he is merely challenging decisions "with regard to compensation," 34 U.S.C. § 20144(b)(3), then, he suggests, <u>any</u> challenge to the Fund's operation that may yield an increased payout could be characterized as concerning compensation and thus be precluded.  <u>See</u> ECF No. 13 (Pl. Opp.) at 2.  This expansive reading would not respect the "strong presumption" in favor of judicial review.  <u>Bowen</u>, 476 U.S. at 670.

Defendants alternatively rejoin that the statute's purpose and structure bar review here, and they cite the key implied-preclusion case, <u>Block v. Community Nutrition Institute</u>, 467 U.S. 340 (1984), as well as <u>Schneider v. Feinberg</u>, 345 F.3d 135 (2d Cir. 2003), which involved a challenge to the regulations promulgated by the September 11th Victim Compensation Fund's special master.  <u>See</u> Def. MTD at 13–15.

These preclusion questions are taxing to resolve.  While, for instance, Braun's challenge to the retroactivity of the Clarification Act seems less likely to be precluded, he has a more difficult task with his objections to distributions.  That said, the provision's use of "each claimant" may serve to bar review of individual determinations while still allowing courts to consider programmatic challenges to the Fund's operation.  <u>See</u> 34 U.S.C. § 20144(b)(3) (final and unreviewable decisions must be provided in writing to "each claimant").  The Court, believing discretion the better part of valor, will ultimately sidestep these questions and move to the merits.  Although it may not so assume constitutional jurisdiction, it may where statutory jurisdiction is challenged.  <u>See</u> <u>Am. Hosp. Ass'n v. Azar</u>, 964 F.3d 1230, 1246 (D.C. Cir. 2020) ("The law of our circuit allows a court to assume hypothetical <u>statutory</u> jurisdiction even if we cannot assume Article III jurisdiction."); <u>accord</u> <u>Butcher v. Wendt</u>, 975 F.3d 236, 242–44 (2d Cir. 2020).

The Court, accordingly, will proceed as if review were not precluded here and will now assess the merits of each of Braun's causes of action under the APA.

B.  Merits

To survive a motion to dismiss, an APA claim must both challenge a final agency action and articulate the infirmities of such action.  See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."); id. § 706 (setting forth "scope of review" of agency action).  Although courts often assess the finality of an agency action before reviewing its legality, this order of analysis is not strictly required.  As the Supreme Court made clear in Califano v. Sanders, 430 U.S. 99, 107 (1977), the APA does not confer jurisdiction.  From that premise, the D.C. Circuit has specifically stated, "§ 704's declaration that final agency action is 'subject to judicial review' is not a grant of jurisdiction . . . ."  Trudeau, 456 F.3d at 183; see also Oryszak v. Sullivan, 576 F.3d 522, 525 n.2 (D.C. Cir. 2009) ("[T]he provision of the APA limiting judicial review to 'final agency action,' 5 U.S.C. § 704, goes not to whether the court has jurisdiction but to whether the plaintiff has a cause of action . . . .").

Since the finality requirement is not jurisdictional, the Court need not address it before considering other aspects of Plaintiff's APA claims.  Indeed, the D.C. Circuit took this very approach in Trudeau.  It assumed the object of Trudeau's challenge — an FTC press release — was a final agency action and then proceeded to dismiss his complaint for failure to state a claim. See 456 F.3d at 191–92 ("We are permitted to proceed in this manner because '[w]hether a cause of action exists is not a question of jurisdiction, and may be assumed without being decided.'") (quoting Air Courier Conf. v. Am. Postal Workers Union, 498 U.S. 517, 523 n.3 (1991)).

In this case, the Court follows a similar path: even assuming Plaintiff has challenged a final agency action, his claims cannot proceed because they either do not present viable readings of the statute or are moot.  The Court addresses each of his four separate challenges in turn.

### 1.  Retroactivity of Deposit Requirement

Plaintiff's first claim relates to the Clarification Act, which the reader may recall increased the percentage of civil penalties deposited into the Fund.  Braun maintains that the Act should have retroactive effect and apply to penalties collected before its 2019 enactment.  See Compl., ¶¶ 31–33.  By his account, this treatment would add $500 million to the Fund, which could then disburse another round of payments to Plaintiff and his fellow claimants.  Id., ¶ 41. Braun faces long odds on such a claim, as a statute's language must clearly command retroactive application for it to yield such a result.  Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988); see also INS v. St. Cyr, 533 U.S. 289, 316–17 (2001) ("The standard for finding such unambiguous direction is a demanding one[,] . . . [requiring] 'statutory language that was so clear that it could sustain only one interpretation.'") (quoting Lindh v. Murphy, 521 U.S. 320, 328 n.4 (1997)).

The text of the Clarification Act does not fall into such a category.  The applicability provision states, "This section and the amendments made by this section shall take effect on the date of enactment of this Act."  Pub. L. No. 116-69, § 1701(d) (emphasis added).  That date was November 21, 2019.  Id.  As to the specific change to increase the deposit of civil penalties, the Clarification Act's only revision was to strike "[o]ne-half" and replace it with "[s]eventy-five percent" in two places.  Id. § 1701(b)(1)(D)(i).

Braun's misreading derives from the fact that the Terrorism Act originally specified that penalties would accrue to the Fund "after the date of enactment of this Act," which was

December 18, 2015.  When Congress later passed the Clarification Act, the Office of the Law

Revision Counsel (OLRC) updated the percentages in its codification but left that original

effective date in place.  Compare ECF No. 1-1 (Original Codification) at 4, with ECF No. 1-3

(Amended Codification) at 4; see generally Jesse M. Cross & Abbe R. Gluck, The Congressional

Bureaucracy, 168 U. Pa. L. Rev. 1541, 1572 (2020) (describing OLRC's function).

      Rather than relying on OLRC's codification, the Court consults the public laws actually

passed by Congress.  Compare 1 U.S.C. § 112 (public laws in statutes at large "shall be legal

evidence of laws"), with id. § 204(a) (codified text establishing only "*prima facie*" evidence of

law); see also U.S. Nat'l Bank of Oregon v. Indep. Insurance Agents of Am., Inc., 508 U.S. 439,

448 (1993) ("Though the appearance of a provision in the current edition of the United States

Code is '*prima facie*' evidence that the provision has the force of law, it is the Statutes at Large

that provides the legal evidence of laws.") (cleaned up); United States v. Weldon, 377 U.S. 95,

98 n.4 (1964) ("The very meaning of *prima facie* is that the Code cannot prevail over the Statutes

at Large when the two are inconsistent.") (cleaned up).

      As mentioned above, a quick scan of the public laws reveals that Congress did not intend

for the Clarification Act to apply retroactively.  Indeed, the public-law version of the Act makes

no mention of a December 2015 date.  Rather, it is clear that Congress made the Act effective

from its date of enactment, as it explicitly stated in its applicability provision.  See Pub. L. No.

116-69, § 1701(d).  Plaintiff's quest for retroactive application thus goes nowhere.

           *2.  Supplemental Third Distribution*

      Braun's second claim argues that giving retroactive effect to the Clarification Act would

purportedly yield an increase of $500 million to the Fund, which would mean that claimants —

including Plaintiff — could receive additional distributions.  See Compl., ¶ 41.  Because the

Court has just determined that the Act cannot be given retroactive effect, there is nothing additional to pay out.  Plaintiff himself recognizes that his second claim depends on the success of his first.  Id., ¶ 45 ("If Plaintiff prevails on the first claim[,] . . . Defendant Treasury will be required to deposit in to the Fund . . . ."); Pl. Opp. at 8 ("Plaintiff's second claim for relief assumes that Plaintiff prevails on the first.") (footnote omitted).  This count, too, does not survive.

### 3.  Appointment of Special Master

Braun's third cause of action seeks an injunction requiring the Attorney General "to appoint a Special Master going forward if there is more than $100 million in the Fund" and ordering that the Special Master "make a distribution in 2021."  Compl., ¶¶ 4, 59.

Resolving the first part of this claim is straightforward because the Attorney General has recently appointed a Special Master.  She is Mary Patrice Brown, a highly regarded attorney who began her tenure on January 4, 2021.  See ECF No. 14 (Def. Reply) at 10; Dep't of Justice, U.S. Victims of State Sponsored Terrorism Fund, http://www.usvsst.com (last updated Feb. 16, 2021).  Braun's request for an injunction mandating appointment is thus moot; to the extent that he seeks broader declaratory relief, his claim would not be ripe.

The second component of this count seeking a 2021 distribution fares no better.  As the Government correctly notes, Plaintiff wrongly assumes that the $100-million threshold for appointing a Special Master also triggers distributions from the Fund.  See Def. MTD at 24. While the statute does require the Attorney General to appoint a Special Master whenever the Fund has more than $100 million, see 34 U.S.C. § 20144(b)(1)(A)(ii), it does not set a threshold for mandating distributions from the Fund.  Rather, the statute simply states that the Special Master "shall authorize additional payments" on an annual basis "if funds are available in the

Fund." Id. § 20144(d)(4)(A).  Nowhere does it equate $100 million with funds being available.
Since the statute does not compel the Special Master to make a distribution when the Fund's
balance exceeds $100 million, Plaintiff's third claim yields no success.

### 4.  Required Distributions and Timeline

Braun's final count requests a declaratory judgment to clarify the Fund's required
timelines.  Under its statutory framework, the Fund was required to "authorize third-round
payments" no later than "180 days[] after November 21, 2019."  Id. § 20144(d)(4)(B).  In
addition, the statute orders the Special Master to "authorize additional payments" by January 1 of
each year that she finds funds are available.  Id. § 20144(d)(4)(A).  Plaintiff urges the Court to
declare that the Fund should have paid (instead of merely authorizing) third-round distributions
by May 19, 2020, and that it must make future payments each year and specifically by January 1.
See Compl., ¶¶ 6, 79–80.

Plaintiff's claim thus presents two issues — the first is whether the Fund must dispense
compensation each year; the second is precisely when it must make these payments, which turns
on what "authorize payment" means.  On the first question, the Court finds that the Fund is not
required to make distributions each year.  The statute leaves it within the Special Master's
discretion to determine if there are sufficient funds to make future distributions.  See 34 U.S.C.
§ 20144(d)(4)(A) ("[The Special Master] shall authorize additional payments for eligible claims
annually thereafter if funds are available in the Fund.") (emphasis added).  As the Government
cautions, a positive balance in the Fund "does not mean that there are funds available for a
distribution."  Def. MTD at 24.  Indeed, the statute provides for administrative expenses of the
Fund and requires it to reserve payments for certain creditors whose judgments are pending.  See
34 U.S.C. §§ 20144(b)(1)(B)–(C), (e)(2)(B)(iv); Special Master June 2020 Report at 8.  Both are

expenses that could foreclose a distribution even when the Fund's balance appears flush.  See Def. MTD at 24–25.  Most importantly, the statute conditions future distributions on funds being "available" but does not specify when "funds are available."  In other words, the statute provides "no meaningful standard against which to judge the agency's exercise of discretion."  Heckler v. Chaney, 470 U.S. 821, 830 (1985).  Reviewing the Special Master's decision to authorize rounds of payments in future years is therefore precluded because it is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).

The second question raised by Plaintiff's claim is when the Special Master must authorize payment after she has elected to make a distribution.  At the core of this issue is what "authorize payment" means.  The parties present competing definitions: Braun believes this equates with payment itself, while the Government posits that it simply means to determine eligibility to receive payment.  See Compl., ¶ 76; Def. MTD at 25–26.

The Court believes Defendants have the stronger position.  Their interpretation is grounded in the statutory text, which uses "authorize" differently from "expend."  Compare 34 U.S.C. §§ 20144(d)(2), (d)(4)(A)–(B), (e)(6)(B), with id. §§ (e)(5), (e)(6)(B).  This meaningful variation clarifies that "authorize" does not simply mean "expend" or "pay."  Indeed, the statute's sunset clause concretely illustrates the difference.  This clause prohibits funds from being "obligated on or after January 2, 2030."  Id. § 20144(e)(6)(A).  Then it states: "Effective on the day after all amounts authorized to be paid from the Fund under this section that were obligated before January 2, 2030 are expended, any unobligated balances in the Fund shall be transferred" to other funds.  Id. § 20144(e)(6)(B).  To translate: authorization is a precursor to expenditure.  By requiring funds be obligated before January 2, 2030, but allowing them to be disbursed later, the statute envisions that funds may be expended after they are authorized and

14

obligated.  As a result, Plaintiff's fourth claim, which aims to commit the Fund to make payments by specified dates, also founders.

**IV.      Conclusion**

For the foregoing reasons, the Court finds that even if it had jurisdiction over Braun's suit, Plaintiff has failed to state meritorious claims.  The Court, therefore, will grant Defendants' Motion to Dismiss for failure to state a claim.  A separate Order consistent with this Opinion will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 8, 2021